NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____  :
                               :
ROBERT J. WILHELM, SR.,        :
                               :
           Plaintiff,          :    Civil No. 05-5304 (RBK)
                               :
           v.                  :    **OPINION**
                               :
JO ANNE B. BARNHART,           :
COMMISSIONER OF SOCIAL         :
SECURITY,                      :
                               :
           Defendant.          :
_____  :

**KUGLER**, United States District Judge:

This matter comes before the Court upon appeal by Plaintiff Robert J. Wilhelm, Sr. ("Wilhelm"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, this case will be remanded to the Commissioner for further proceedings.

## I.   Background and Procedural History

Wilhelm, born on June 13, 1958, alleges that he became disabled on December 30, 2000, due to pain in his lower back, hip, and shoulder associated with degenerative lumbar disease. (Admin. Rec. ("Rec.") at 29-30, 31.)  In addition, Wilhelm

alleges numbness in his right leg, a torn rotator cuff in the left shoulder, and mental impairment. (Rec. at 34, 37, 38.)

Wilhelm is single and currently resides by himself in Monroeville, New Jersey.  (Rec. at 36, 94.)  He has a high school education (Rec. at 28, 124.)  Since 1994 and until his injury, Wilhelm worked in the auto detailing business, an occupation which he described as requiring a medium level of physical activity.  (Rec. at 29, 116, 134-41.)  This job required Wilhelm to do various tasks that required lengthy sitting, handling small objects, and occasional walking and standing. (Rec. at 139.) Wilhelm alleges that he could no longer continue as a car detailer as of December, 2000, and has not engaged in any substantial gainful activity since that time. (Rec. at 28-29.) Wilhelm previously received Social Security Disability Benefits for a period from March 1993 through December 1994.  (Rec. at 29.)

Wilhelm filed an application for DIB and SSI on December 16, 2002. (Rec. at 92-95).  He supplemented this application with a Disability Report on January 11, 2003, in which he alleged back pain, a tear in his left rotator cuff, and neck pain which rendered him unable to work. (Rec. at 115.)  The Social Security Administration ("Administration") denied Wilhelm's application on March 31, 2003 (Rec. at 61-66.), and his request for reconsideration on November 14, 2004. (Rec. at 69-71, 72-75.)  On

December 5, 2003, Wilhelm filed a timely request for a review by
an Administrative Law Judge ("ALJ") and was heard before ALJ
Craig DeBernardis on October 8, 2004. (Rec. 76, 25-57.)

Judge DeBernardis denied Wilhelm's claims on January 24,
2005, concluding that Wilhelm "was not under a 'disability', as
defined in the Social Security Act, at any time through the date
of this decision." (Rec. at 23.) Wilhelm requested review by the
Appeals Council on January 31, 2005, but the Appeals Council
denied his request on September 12, 2005, making the ALJ's
determination the Commissioner's final decision. (Rec. at 5-7.)
See Sims v. Apfel, 530 U.S. 103, 107 (2000) (citing 20 C.F.R. §§
404.900(a)(4)-(5), 404.981, 422.210(a)).  Wilhelm filed the
present action before this Court on November 9, 2005.

    **A.    Administrative Hearing**

Wilhelm and Gary A. Young, a vocational expert, were the
sole witnesses at the administrative hearing before Judge
DeBernardis.  During the hearing, Wilhelm testified that he
became disabled in December 2000 as a result of his degenerative
lumbar disease worsening to the point were he felt like his body
was "deteriorating."  (Rec. at 29-30.)  He testified that he is
unable to work because of severe pain, which he experiences in
his low back, hip, and shoulder.  (Rec. at 31.) He also claimed
to suffer from depression, hindering his ability to think,
concentrate, and remember (Rec. at 38.)  Wilhelm stated that he

had treated with Dr. Frederick George, and orthopedic surgeon, and Dr. Wilston, a psychiatrist for his various medical conditions.  (Rec. 30-31.)  Both doctors prescribed Wilhelm with pain and anti-depressive medications, which bring him little relief, but have no side effects.  Id.  Wilhelm has had not surgery for his conditions, and none was advised.  (Rec. at 38-39.)

In addition to his medical treatment, Wilhelm reported functional limitations relating to his conditions, including limitations on his ability to walk and other daily activities. (Rec. at 31-37.)  Specifically, Wilhelm indicated difficulty walking more than two blocks, at which point he must take a fifteen to twenty minute break.  (Rec. at 32.)  Additionally, Wilhelm posited that he is only able to stand for five minutes and cannot sit comfortably for any length of time due to pain. Id.  Furthermore, Wilhelm indicated difficulty sleeping, using the bathroom, engaging in sexual activity, lifting anything heavier than a gallon of milk, and using his left hand for activities such as opening jars or handling small items.  (Rec. at 31, 40, 33, 34, 37.)  Wilhelm is unable to drive or do household chores, but is able to ride a bicycle for a "little bit." (Rec. at 36, 32.)  His son, daughter, and friend help him with shopping, storing food, washing clothes, transportation, and other needs.  (Rec. at 36-37.)  Wilhelm expressed that he has no

4

hobbies and engages in no activities.  (Rec. at 37.)

Following Wilhelm's testimony, Gary A. Young testified at the administrative hearing as a vocational expert.  (Rec. at 42-55).  Judge DeBernardis asked Mr. Young to consider a hypothetical individual of plaintiff's age, education, and work experience who could lift up to ten pounds occasionally, up to ten pounds frequently, stand and/or walk for a total of two hours in an eight-hour work day, and sit for a total of six hours in an eight-hour work day with an option to sit and stand at will; would be limited to occasional pushing/pulling with both upper and lower extremities, occasional climbing of stairs and/or ramps, occasional balancing, and occasional stooping; who must never climb ladders, roofs and scaffolds, and never roll; who could rarely kneel; who must avoid concentrated exposure to temperature extremes; who requires a stable work environment in which there are no more than occasional changes in work dates, tools, procedures, etc; who could not perform complicated tasks; who could make simple decision; who has the ability to frequently interact with supervisors, co-workers, and the public; and who has occasional lapses of mental concentration.  (Rec. at 43.) In response to the question of whether the person in the hypothetical could work as an auto detailer, Mr. Young answered in the negative.  Id.  However, Mr. Young was asked whether there would be other jobs for a person with this set of assumptions, he

5

answered in the affirmative, and offered examples of sedentary, unskilled jobs, such as an assembler and production inspector. (Rec. at 43-44.)  Mr. Young confirmed that there are 4,500 assembler jobs regionally and 200,000 nationally, and that there are approximately 600 production inspector jobs regionally, and 9,000 nationally.  (Rec. at 44.)

The ALJ posed an additional hypothetical question to Mr. Young, which assumed that the hypothetical individual could do less than sedentary exertion.  (Rec. at 44.)  When asked whether there would be any jobs this hypothetical person could perform, Mr. Young answered in the negative. Id.

In response to a cross-examination of Mr. Young by Wilhelm's counsel, which raised the question of whether the sit-stand option was properly accounted for in the answers to the previous hypotheticals, the ALJ posed a third hypothetical in which he eliminated the sit-stand option entirely.  (Rec. at 55.) When asked whether there would be any jobs in the national economy in which the hypothetical person could perform, Mr. Young responded that the hypothetical person could perform a sedentary job and that there would be an increase in the number of jobs available given the absence of the sit/stand option.  Id.  In addition to the jobs Mr. Young had already identified, clerical office positions would also be included.  Id.

6

### B.    Treatment History of Physical Impairment

Wilhelm's medical records indicate that he has been receiving treatment for spinal pain since 1993. (Rec. at 209, 200-205, 198-99, 167-197, 160-199.)  In 1997, be began to receive treatment from Dr. Frederick George at Orthopaedics at Wooodbury. (Rec. at 197.)  During his initial visit, Wilhelm disclosed that he struck a tree while skiing several years earlier, resulting in neck and left shoulder pain.  Id.  He also disclosed that he slipped an fell on the ice in 1993 and experienced acute pain in his neck, back and knees.  Id.  Dr. George noted the findings of a November 30, 1993 magnetic resonance imaging ("MRI") of Wilhelm's lumbar spine, which showed degenerative disc disease at L3-4, L4-5 and L5-S1.  (Rec. at 197, 210.)  Additionally, an MRI on November 18, 1993 showed evidence of a syrinx, but no disc herniation.  (Rec. at 197, 209, 211.)  A May 12, 1995 MRI of Wilhelm's left shoulder was suspicious for a rotator cuff tear with degenerative changes in the acromioclavicular ("AC") joint. (Rec. at 197, 212.)  Dr. George concluded that Wilhelm suffers from chronic cervical sprain, tendinitis of the left shoulder with possible rotator cuff tear, degenerative disc disease of the lumbar spine, and chondromalacia of the patella of both knees. (Rec. at 196.)  Dr. George ordered a repeat MRI of Wilhelm's lumbar spine, which was conducted in November 1997 and showed discogenic degenerative changes at levels L3-4, L4-5, and L5-S1

7

with bilateral neural foraminal encroachment upon the L5 nerve root.  (Rec. at 198-99.)

Wilhelm continued to present to Dr. George from 1998-2000 with complaints of chronic pain in his neck, low back, knees and left shoulder. (Rec. at 178-95.)  Repeat examinations indicated tenderness in Wilhelm's neck, shoulders, knees, and low back. (Rec. at 183-193).  An examination in February 2000 revealed a trace effusion in both knees, and tenderness in plaintiff's neck, back, elbows, and both knees. (Rec. at 182.) Throughout these years, Wilhelm indicated that, while he was unable to function without pain medications (Lortab and Valium), he was unwilling to be evaluated by a pain management physician or receive psychiatric or psychological care. (Rec. at 182, 190-95.) Additionally, he refused treatment through steroid injections. (Rec. at 188, 190.)

Following the alleged onset date of Wilhelm's disability through October 2003, Wilhelm continued to treat with Dr. George. (Rec. at 167-77.) During his January 29, 2001 follow up visit, Wilhelm reported moderate pain in multiple joints, but indicated that he was still working.  (Rec. at 177.)  This examination revealed mild effusion in both knees, tenderness in the low back, and range of motion to seventy-five percent of normal.  Id. Wilhelm had tenderness in the rotator cuff areas of both shoulders with slight limited motion and his neurological

examination remained normal.  Id.

Wilhelm treated with Dr. George again several times in 2001, each time complaining of continued neck, low back, and shoulder pain.  (Rec. at 174-77.)  Although Lortab and Valium controlled his spasms, Dr. George advised Wilhelm to try to wean off the medication.  (Rec. at 176.)  By his November, 30, 2001 visit, Wilhelm indicated that he had not taken medication for some four months, but Dr. Gorge prescribed him Valium to "tide him over until he is able to receive some treatment through a pain clinic."  (Rec. at 174.) Dr. George's records indicate that Wilhelm had been working since July 31, 2001 through the date of the appointment.  (Rec. at 174-75).

Wilhelm's records indicate that he did not return to Dr. George for treatment again until January 27, 2003. (Rec. at 171.) In the interim, Wilhelm presented to the emergency room at Underwood-Memorial Hospital complaining fo right leg numbness on June 6, 2002.  (Rec. at 201-05).  His neurological examination was unremarkable and he was encouraged to consult a pain specialist.  (Rec. at 204-05.)  When Wilhelm returned, to Dr. George in January the following year, however, he continued to complain of acute pain in his low back with radiation, as well as bilateral shoulder, knee, and neck pain.  (Rec. at 171.)  Wilhelm indicated to Dr. George that he had not been able to work for approximately three or four months because of pain.  Id.  Dr.

9

George's examination revealed tenderness in Wilhelm's low back
and right buttock, reduced range of motion, a trace of spasm, and
a slight limp on Wilhelm's right side.  Id.  Moreover, Dr. George
commented on a recent lumbar x-ray, which showed degenerative
disc disease of the lumbar spine with possible stenosis,
prompting Dr. George to request a repeat MRI.  Id.

Wilhelm's February 7, 2003 MRI revealed diffuse disc bulging
at the L3-4, L4-5, and L5-S1 levels.  (Rec. at 170-73, 207-08.)
At the L3-4 level there was mild compression on the thecal sac,
and at the L4-5 level there was minimal impression on the thecal
sac.  Id.  At the L5-S1 level, the disc material resulted in mild
impression on the thecal sac.  Id.  There was a prominent degree
of right-sided L5-S1 neural foramen narrowing with disc material
impinging upon the exiting right L5 nerve root with the neural
foramen.  Id.

Dr. George indicated some improvement in Wilhelm upon his
February 21, 2003 visit, noting an improved range of motion,
"mild" spasm in the low back, and tenderness in the low back and
right buttock.  Id.  Wilhelm's straight leg raising test produced
pain at 60 degrees, but his neurological examination remained
normal.  Id.  Dr. George concluded that Wilhelm continued to
suffer from degenerative disc disease of the lumbar spine with
nerve root impingement.  (Rec. at 170.)  Wilhelm continued to not
consider any epidural or other injections.  Id.  His examinations

10

with Dr. George remained unchanged through October 2003.  (Rec. at 167-70.)

At the Commissioner's request, Dr. Nithyashuba Khona conducted an orthopedic examination of Wilhelm on March 19, 2003. (Rec. at 217-20.)  Dr. Khona concluded that Wilhelm was not under acute distress.  (Rec. at 218.)  She observed that he ambulated with a slight limp on the right side, but that his station was normal.  Id.  Morever, he used no assistive device, and needed no help changing for the exam, except to put back his sock on the right foot.  Id.  He was able to rise from a chair, and needed no help getting on and off the examination table.  Id.  Furthermore, Wilhelm's exhibited intact hand and finger dexterity, with a full grip strength to 5/5 bilaterally.  Id.  Examination of Wilhelm's cervical spine was normal, and examination of his upper extremities revealed full range of motion of his right shoulder but resistence in the left.  Id.  There was full range of motion of his elbows, forearms, wrists and fingers bilaterally.  Id. There was no joint inflammation, effusion, or instability and his strength was full.  Id.

Dr. Khona documented that the range of motion in Wilhelm's lumbar spine was limited, but found that there was no spinal or paraspinal tenderness.  (Rec. at 218-19.)  She also noted sciatic notch tenderness on the right side, but no spasm.  (Rec. at 219.) Wilhelm's straight leg raising test was negative.  Id.

11

Nonetheless, her reading of Wilhelm's lumbar spine x-ray prompted her to conclude that he suffers from degenerative disc disease at L3-4 through L5-S1.  She opined that he was "mildly" restricted in lifting, kneeling, and squatting.  Id.

Also at the Commissioner's request, Wilhelm underwent a psychological examination by Dr. Hugh D. Moore on November 11, 2003 (Rec. at 231-234.)  Dr. Moore's examination revealed that Wilhelm had no history of psychiatric hospitalization and the last time he was treated by a psychiatrist was in 1982.  Id. Nevertheless, Wilhelm reported symptoms of depression including psychomotor retardation, loss of usual interest, increased irritability, psychomotor agitation, fatigue, loss of energy, diminished self-esteem, and diminished sense of pleasure.  (Rec. at 232.)  Despite these symptoms, Wilhelm indicated that he was able to dress, bathe, and groom himself, as well as cook, clean, relate will with others, concentrate and perform simple calculations.  (Rec. at 233-234.)  Wilhelm further related that he spent most of his days doing chores, reading, watching television, and listing to the radio.  (Rec. at 234.)

Based upon his findings that Wilhelm's thought processes were coherent and goal oriented, and that he exhibited a calm mood, good orientation, memory skills, good insight, and average intelligence, Dr. Moore diagnosed Wilhelm with adjustment disorder, not otherwise specified.  Id.  He posited that Wilhelm

is capable of understanding, remembering, and following simple instructions and directions.  Id.  Furthermore, he opined that Wilhelm is capable of performing simple and complex tasks with supervision, and independently.  Id.  Specifically, Dr. Moore found that Wilhelm is capable of maintaining attention and concentration for tasks, regularly attending to a routine, maintaining a schedule, and learning new tasks.  Id.  He added that Wilhelm is capable of making appropriate decisions, getting along well with others, and dealing with stress.  Id.

Dr. P.A. Spearman, a state agency medical consultant, reviewed Wilhelm's medical records and concluded on November 21, 2003, that Wilhelm did not have a severe psychiatric impairment. (Rec. at 236-49).  He offered that Wilhelm possesses no restriction of activities of daily living, and no difficulties in maintaining social functioning.  (Rec. at 246.)  He found that, while Wilhelm had only "mild" difficulties in maintaining concentration, persistence or pace, he had "never" experienced repeated episodes of deterioration.  Id.

### C.   Judge DeBernardis's Opinion

In determining that Wilhelm is not disabled for the purpose of the Social Security Act ("SSA"), Judge DeBernardis first determined that Wilhelm had not engaged in any substantial gainful activity since his alleged onset date of December 30, 2002.  (Rec. at 15, 22.)  He then found that Wilhelm's disorders

13

of the spine constitute "severe" impairments within the meaning of the SSA.  <u>Id.</u>  Judge DeBernardis concluded, however, that Wilhelm's knee, left shoulder, cervical spine, and mental impairments are not severe.  (Rec. at 15-17, 22.) Despite the existence of these impairments, Judge DeBernardis found that Wilhelm's allegations as to the severity of his symptoms and limitations in relations to his ability to perform basic work activities were not persuasive.  (Rec. at 22.)

Overall, Judge DeBernardis concluded that, while Wilhelm cannot perform his past relevant work, there are "a significant number of jobs in the national economy that [Wilhelm] can perform."  (Rec. at 21.)  Judge DeBernardis based his conclusion upon his residual functional capacity assessment, finding:

> [Wilhelm] retains the residual functional capacity to lift and/or carry up to ten pounds occasionally and frequently; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday, provided that he can sit and/or stand at will; push and/or pull occasionally with is upper an lower extremities; climb stirs and ramps occasionally, ladders, ropes, and scaffolds never; balance and stoop occasionally; kneel, crouch, and crawl never; withstand temperature extremes, wetness, humidity, vibration, heights, and hazardous machinery, provided that he avoids concentrated exposure to the same."

(Rec. at 19,22.)

## II.  Standard of Review

This Court's review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by

14

substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Halter, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (holding that a district court may not "weigh the evidence or substitute its conclusions for those of the fact-finder") (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire

15

record or failed to resolve an evidentiary conflict. <u>See</u>
<u>Schonewolf v. Callahan</u>, 972 F. Supp. 277, 284-85 (D.N.J. 1997)
("[U]nless the [Commissioner] has analyzed all evidence and has
sufficiently explained the weight he has given to obviously
probative exhibits, to say that his decision is supported by
substantial evidence approaches an abdication of the court's duty
to scrutinize the record as a whole to determine whether the
conclusions reached are rational.") (quoting <u>Gober v. Matthews</u>,
574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not
substantial if "it constitutes not evidence but mere conclusion,"
or if the ALJ "ignores, or fails to resolve, a conflict created
by countervailing evidence." <u>Wallace v. Sec. of Health and Human</u>
<u>Servs.</u>, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing <u>Kent</u>, 710 F.2d
110, 114 (3d Cir. 1983)).


**III. Analysis**

     The Commissioner conducts a five step inquiry to determine
whether a claimant is disabled. 20 C.F.R. § 404.1520; <u>Jones v.</u>
<u>Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner
first evaluates whether the claimant is currently engaging in a
"substantial gainful activity." Such activity bars the receipt of
benefits. 20 C.F.R. § 404.1520(a).  The Commissioner then
ascertains whether the claimant is suffering from a severe
impairment, meaning "any impairment or combination of impairments

16

which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the Commissioner finds that the claimant's condition is severe, the Commissioner evaluates whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues on to step four to evaluate the claimant's residual functional capacity ("RFC") and determine whether the RFC would entitle the claimant to return to his "past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work precludes a finding of disability. If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

Wilhelm argues that the Commissioner (1) failed to properly determine Wilhelm's RFC and (2) failed to comply with Social Security Ruling ("SSR") 83-12 when taking into account the vocational expert's testimony to determine Wilhelm's ability to perform work available in significant numbers in the national economy.

## A.   Determination of Wilhelm's RFC

Wilhelm contends that his RFC was improperly determined, as Judge DeBernardis incorrectly determined disregarded evidence of Wilhelm's mental impairment and the Appeals Council did not consider supplemental records from Dr. George.  An individual's RFC is defined in the Commissioner's regulations as the most an individual can still do after considering the physical and/or mental limitations affecting his ability to perform work-related tasks.  20 C.F.R. § 416.945.  In the present matter, it is necessary to ascertain whether the ALJ's assessment of Wilhelm's RFC was supported by substantial evidence.

1.  <u>Mental Impairment</u>

In his opinion, Judge DeBernardis found that Wilhelm's "mental impairment is . . . not severe."  (Rec. at 22.)  He stated:

> [T]here is no evidence that the claimant has a serious mental impairment.  The claimant offered no evidence that he has received psychiatric treatment.  Dr. Hugh D. Moore, a psychologist, examined the claimant on November 11, 2003, in connection with his application for disability benefits. "Results of the examination do not appear to be consistent with any psychiatric problems that would significantly interfere with the claimant's ability to function on a daily basis."  The psychologist who subsequently reviewed the record for DDS held that the claimant has no severe mental impairment.

(Rec. at 17) (citations omitted).

Wilhelm contends that Judge DeBernardis failed to account for the treatment records of neuropsychiatrist John R. Rushton, M.D..  Wilhelm contends that these records were sent via

18

facsimile to the Office of Hearings and Appeals on December 30, 2004 - after the October 8, 2004 hearing before Judge DeBernardis but before he issued his January 24, 2005 opinion - and that they were also attached to Wilhelm's Appeals Council Memorandum. Wilhelm contends that these records indicate that Wilhelm "had no useful ability to function in all areas due to his severe depression." (Pl.'s Br. at 14.)

The Commissioner argues that the Dr. Rushton's records do not state that Wilhelm has a severe mental impairment. The Commissioner states that Dr. Rushton's handwritten notes are illegible, and that Dr. Rushton's finding that Wilhelm "has no useful ability to function" is without support from either Dr. Rushton's own findings or those of Drs. Moore and Spearman. (Def.'s Br. at 17.) Therefore, the Commissioner concludes, Dr. Rushton's records are "not indicative of the presence of a severe mental impairment." The Commissioner further asserts that the opinions of Drs. Moore and Spearman constitute sufficient evidence upon which Judge DeBernardis based his finding that Wilhelm did not suffer from a mental impairment.

While Judge DeBernardis may have been justified in deciding to give little or no weight to the opinion of Dr. Rushton, he did not explicitly decide to do so. Rather, he appears to have ignored these records altogether; indeed, his opinion states that "the claimant offered no evidence that he has received

19

psychiatric treatment," (Rec. at 17), an assertion which is clearly at odds with Dr. Rushton's finding that Wilhelm has no useful ability to function and that Wilhelm is "[d]epressed, severely so!" (Pl.'s Br. Ex. 1.) While Judge DeBernardis may have been entitled to reject Dr. Rushton's findings based on the reports from Drs. Moore and Spearman, he "must consider all the evidence and give some reason for discounting the evidence [he] rejects." Plummer, 186 F.3d at 429. If the reports are in conflict with one another, then Judge DeBernardis "may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Id. (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). Judge DeBernardis therefore erred in failing to address the evidence contained in Dr. Rushton's report and provide his rationale for disregarding it, and this Court subsequently concludes that Judge DeBernardis's determination of Wilhelm's RFC was not based on "substantial evidence," as it "ignore[d], or fail[ed] to resolve, a conflict created by countervailing evidence." Wallace, 722 F.2d at 1153. Accordingly, this Court will order this case remanded to the Commissioner for consideration of all evidence regarding Wilhelm's mental health. See Fargnoli, 247 F.3d at 42 ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand

a case where such an explanation is not provided.").

2.   Supplemental Medical Records

Wilhelm also contends that the Appeals Council failed to address supplemental records provided by Dr. George.  In these records, Dr. George's March 1, 2005 remarks state that "I do not feel [Wilhelm] is capable of returning to gainful work at this time." (Pl.'s Br. Ex. 2.)  While these records did not exist at the time of Judge DeBernardis's opinion, they were submitted to the Appeals Council prior to its denial of Wilhelm's request for review.

The Appeals Council reviews cases where: "(1) There appears to be an abuse of discretion by the administrative law judge; (2) There is an error of law; (3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or (4) There is a broad policy or procedural issue that may affect the general public interest."  20 C.F.R. § 404.970(a). Moreover,

> [i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).

In denying review, the Appeals Council stated that it "found no reason under our rules to review the Administrative Law Judge's decision."  (Rec. at 5.)

A district court enjoys a greater ability to remand a case to the Commissioner based on facts that were in the record made before the ALJ than it does based on evidence that was not presented to the ALJ.  See Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001) ("To summarize the options open to the district court, when the Appeals Council has denied review the district court may affirm, modify, or reverse the Commissioner's decision, with or without a remand based on the record that was made before the ALJ. . . . However, when the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ.").  As this Court has already determined a remand to be appropriate based on the need for the Commissioner to consider the medical opinions of Dr. Rushton, the Commissioner will subsequently be able to further consider the supplemental records provided by Dr. George.  Therefore, a determination of whether this evidence is "new and material and if there was good cause why it was not previously presented to the ALJ" is unwarranted at this time.

### B.   Compliance with Social Security Ruling 83-12

Wilhelm also contends that Mr. Young, the vocational expert, incorrectly determined Wilhelm's ability to perform work available in significant numbers in the national economy. Wilhelm contends that Mr. Young did not appropriately apply the substance of SSR 83-12, and that Mr. Young's opinion therefore did not constitute substantial evidence upon which Judge DeBernardis could base his findings.

Social Security Ruling 83-12 states, in pertinent part:

In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

There are some jobs in the national economy -- typically professional and managerial ones -- in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base.

23

SSR 83-12.

At the hearing before Judge DeBernardis, Mr. Young stated that a job of "constructor's assembly work" was an option for someone with Wilhelm's limitations, and that 4,500 such jobs were available regionally and 200,000 such jobs were available nationally that would allow the employee to sit or stand at will. (Rec. at 43-44.)  Mr. Young offered a job as an inspector as another example, although this job had far fewer opportunities available.  Upon cross-examination, Mr. Young first said that the limitations of SSR 83-12 would change his answer (Rec. at 45,) but later withdrew this opinion, stating that he had mis-spoken. (Rec. at 48-49.)  Mr. Young later stated that if the sit-stand requirement were removed, the number of possible jobs in constructor's assembly work and inspection would double, and that there would also be other jobs that someone like Wilhelm could do.  (Rec. at 55.)

Wilhelm contends that Mr. Young's testimony contradicts the language of SSR 83-12.  The regulation states that "most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will."  SSR 83-12.  However, upon questioning, Mr. Young stated that the jobs in constructor's assembly work and

24

inspection which would permit one to sit or stand at will were neither "extraordinary" nor "atypical."  (Rec. at 54-55.)

Whether Mr. Young considered such employment to be "typical" or not is irrelevant.  The essence of SSR 83-12 is that a vocational specialist should be utilized to determine whether sufficient employment opportunities exist which would accommodate a claimant's need to sit or stand at will.  Mr. Young was in fact this expert, and he testified that such jobs were available in sufficient numbers in the national economy.  The fact that Mr. Young at one point mis-spoke does not diminish Judge DeBernardis's ability to rely on his opinion.  As Judge DeBernardis based his findings on the testimony of Mr. Young, a vocational expert, this Court would ordinarily conclude that such findings were based on substantial evidence.  See Staggers v. Barnhart, No. 03-4507, 106 Fed. Appx. 104 (3d Cir. July 19, 2004) (finding that the ALJ's opinion was based on substantial evidence where "the ALJ had the benefit of vocational expert testimony, particularly with respect to the limitations imposed by the sit or stand option").  However, this Court has already held that Judge DeBernardis failed to consider all necessary evidence before determining Wilhelm's RFC.  As this RFC formed the basis for Mr. Young's conclusions, this Court notes that the Commissioner must re-determine Wilhelm's ability to perform such jobs after taking into account all necessary medical evidence and

properly determining his RFC.

**IV.  Conclusion**

Based on the foregoing reasoning, this Court will order this case to be remanded to the Commissioner for consideration of all medical evidence, including the findings of Dr. Rushton and the supplemental records of Dr. George.  The accompanying Order shall issue today.

Dated: December 12, 2006          s/ Robert B. Kugler
                                  ROBERT B. KUGLER
                                  United States District Judge

26